GEORGE JOHNSON, Plaintiff-Appellee, *v.* HOOVER WATER WELL SERVICE, INC., Defendant and Third-Party Plaintiff-Appellant.—(NORTH RIVERWOOD CENTER, INC., Third-Party Defendant-Appellee.)

Second District   No. 81-853

Opinion filed September 3, 1982.

David R. Quade and Newton E. Finn, both of Diver, Bollman, Grach and Quade, of Waukegan, for appellant.

Ruff, Weidenaar & Reidy, John J. Henely, of Cooney and Stenn, and James E. Quinn, of Quinn and Broderick, all of Chicago, for appellee.

JUSTICE HOPF delivered the opinion of the court:

George Johnson brought a negligence action against Hoover Water Well Service, Inc. (Hoover), in the Lake County circuit court to recover damages for personal injuries suffered by him in an explosion which occurred in an underground water well utility vault located on the property of Johnson's employer, North Riverwood Center (NRC). Hoover in turn sought indemnity or contribution from NRC. By special verdict the jury found Johnson and Hoover both negligent, but found that Johnson's negligence was not a proximate cause of his injuries. Johnson was awarded $909,000 in damages. Hoover's complaint for contribution was dismissed, and the jury found Hoover was not entitled to indemnity from NRC. Hoover appeals.

On the date of the accident, June 8, 1977, Johnson was in charge of maintenance for NRC. Hoover is an independent contractor in the business of installing and servicing water well systems. From 1967 to the time of the accident it serviced NRC's water well system.

Hoover raises a number of issues on appeal. Resolution of these issues requires an understanding of some of the technical aspects of NRC's water well system, as well as the history of the two wells on the property.

Prior to the mid-1960's, NRC acquired its water from a shallow well. An underground well pit, or utility vault, at the site of the well housed the electrical controls for the well and the water storage tank. The utility vault was concrete with a dirt or concrete floor, and was approximately five feet by six feet by five feet deep. The entrance to

the pit was an opening about two feet square which was covered by a solid steel plate. The shallow well itself was vented to above ground. The utility vault, however, was not vented.

In 1963 a deep well was dug about 150 feet from the old shallow well and the old well was disconnected. The vault of the old well, however, was still used to house the electrical controls for the deep well pump. Hoover had no part in the construction of either the shallow or the deep wells, but it was called out by NRC when the deep-well pump needed repair. In 1968 Hoover proposed that the shallow well be reactivated to provide NRC with an emergency water source when the deep well was being repaired. To this end, Hoover installed a nonexplosion-proof pump in the shallow well and a three-wire cable in the pit. The cable provided electricity for the pumps.

The shallow-well pump, when operating, provided water to a storage tank which was buried in the ground but protruded through a wall of the vault so that the face of the tank and pertinent controls could be serviced from the vault. Hoover had also installed air release valves on the tank and an air compressor, which together performed the function of automatically maintaining the correct water pressure. However, according to Michael Butero, former vice president of NRC, the compressor had not worked since 1973. Hoover was not notified of this.

Occasionally, the water pressure would drop when there was too much air in the water storage tank. Johnson testified that he was instructed by Lon Hoover, the president of defendant corporation, to manually bleed air out of the water storage tank when this happened, so the tank would fill up with water. Mr. Hoover denied ever instructing Johnson on this procedure. Johnson testified that up until the day of the accident he never bled air off the tank when the shallow well was operating, but he had done this when the deep well was connected. Michael Butero had also bled the tank on several occasions. Mr. Hoover testified Hoover was never told that either Johnson or Butero were bleeding air manually.

On June 6, 1977, two days before the accident, Hoover was called by NRC to repair the pump. At that time, Hoover removed the deep-well pump and activated the shallow well by temporarily hooking up wires in the utility vault. The wires were exposed.

On the day of the accident, June 8, 1977, plaintiff Johnson was informed by Elizabeth Butero, the owner of NRC, that the water pressure at NRC was low. Johnson went out to the utility pit, removed the steel cover, and lowered himself into the pit. He opened a valve on the water tank to bleed off the air. He began to leave; he

testified he never stayed in the vault while waiting for the air to bleed off. As he began to climb out, and as his head was level with the opening, an explosion occurred. Johnson was knocked back down into the pit and was on fire. He was able to climb out.

Johnson was never trained about working safely in the pit by either Hoover or NRC. He was unaware of a potential gas hazard in the well. He was a pipe smoker and carried his smoking materials in his shirt pocket. However, he testified he was not smoking and did not attempt to light his pipe at the time of the explosion. A witness who saw Johnson as he started climbing out of the pit did not see him attempt to light or smoke a pipe.

Theodore Tarr, fire chief of the Vernon Fire Protection District, arrived at the scene shortly after the explosion. He testified that he looked in the pit and heard a noise of something escaping from a valve on the water tank. The air compressor was not connected to the tank. After closing the air valve, he checked the pit with an explosion meter which checks the explosive ranges of flammable gases, and got a reading which was not in the explosive or hazardous range. He placed the cover back on the well pit and, 30 minutes later, opened the cover a couple of inches, placed the explosion meter into the well pit, and took another air sample. This sample showed the full scale on the explosive range of the meter.

Chief Tarr could not see nor smell any gas. He assumed there was methane gas in the pit because methane is sightless and odorless, and he could determine that no other gas was getting into the pit. Chief Tarr believed that the gas came from beneath the pit, as opposed to coming from the water tank. He testified that the wires in the temporary hookup were exposed, and the cover to the electrical box was open. At the bottom of the pit, Chief Tarr noticed a few spent matches and a matchbook or two. He also observed a closed tobacco pouch and a pipe. He saw no evidence of electrical arcing in the pit.

In Chief Tarr's opinion, the lower area of the pit, where the gas pushes up the air, did not contain sufficient oxygen to support combustion. He was, therefore, of the opinion that the explosion occurred in the upper area of the pit. The electrical boxes, switches and outlets were all in the lower area and could not, according to Tarr, have caused the explosion. He concluded that an attempt to light a smoking pipe in the upper part of the vault caused the explosion. Tarr testified that as of June 8, 1977, he was unaware of any methane gas explosions in his district.

Edward McLain, an industrial engineer, testified as plaintiff's expert witness. McLain testified that methane gas is an odorless gas

which becomes flammable when it reaches the range of 5.33% to 14% in air. He stated that the introduction of air into a well pit in which methane gas is present would change the ratio of air to gas in that space and bring the mixture within the combustible range. In response to a hypothetical in which the circumstances of the explosion and the subsequent investigation were assumed, McLain expressed his opinion that flammable gas had accumulated in the pit and that several possible sources of ignition existed. He testified that lighting a match, striking a boot against a pipe, or electrical arcing from the equipment or wires in the pit could have caused the explosion. He stated that an arcing from the wires would not have been discovered in a subsequent investigation. McLain also testified that the temporary electrical hookup in the shallow well pit violated the National Electrical Code in that the wires were not insulated and the cover of the electrical switch was not closed. According to generally accepted engineering principles, the well pit should have been vented, and it was McLain's opinion that lack of venting contributed to the explosion. He stated that the use of an open-grated manhole cover would have provided adequate ventilation. McLain also testified it is customary when working in such a pit to test the atmosphere for the presence of combustible or toxic gases. It is also customary to have an additional "safety man" present at the site.

According to McLain, the Illinois Water Well Pump Installation Code requires a contractor who installs a well pump to provide for the release of gases from the well system. McLain was unable to identify such a vent in the photographs of the well. Finally, McLain stated that he would expect a contractor who suspected the presence of gas in the well to provide for adequate ventilation and to inform maintenance men of the hazards they might experience while in the pit.

Dr. Paul Torda, a consulting engineer, was defendant's expert witness. Approximately two years after the explosion Dr. Torda inspected the well pit for explosive mixtures and possible sources of ignition. He determined that an explosive, heavier-than-air gas was present in the pit, although he did not know the precise type of gas. Methane is a lighter-than-air gas. Dr. Torda believed that the source of ignition was a lit match since photographs of the scene did not indicate any signs of electrical arcing. Torda testified that the explosion hazard in the vault could have been reduced by testing the atmosphere in the pit before entering, by blowing fresh air into the pit or sucking out hazardous materials before entry, and by having another person present for any underground work. He testified that in 1977 it was the custom for employers to train their employees as to these

procedures.

On cross-examination, Dr. Torda expressed his opinion that the solid steel cover which was on the utility vault was not safe because it provided no ventilation. He testified that nonexplosion-proof electrical connections or a boot striking a pipe in a pit in which explosive gas was present could under certain conditions cause a spark that would ignite the gas. Torda stated that in his opinion an underground pit which accumulates methane gas is a dangerous condition.

Lon Hoover testified that he observed bubbles in the water at the bottom of the shallow well pit prior to June 8, 1977. He stated that he suggested to Johnson's predecessor on the job that the water from the shallow well might support fire. He felt there was a possibility of a gas hazard, but did not know what type of gas was in the water. He had heard stories that there was methane gas in the area, but had never personally witnessed it. His company was never involved with a fire or explosion from gas in its 30 years of operation. In his opinion, the condition of the electrical setup or controls in the pit as of June 1977 was generally poor.

Mr. Hoover stated that on one or two occasions he may have discussed the gas problem with Mr. Butero as part of a sales proposal for drilling another deep well and above-ground utility vault. However, a written proposal to NRC to construct a pumphouse did not discuss the gas problem in the well. He stated he did not recall warning Mrs. Butero or Johnson about a specific danger of methane gas in the well. Hoover testified that it did not manufacture the equipment it installs, but it does select equipment which it considered appropriate for a particular job. The electrical wiring and transformer were in the pit when Hoover began its association with NRC, with the exception of the three-wire cable which provided power for the entire well system.

Hoover testified that he had been in the vault several times, usually to check out the electrical function of the pump to determine whether it needed servicing. He never tested the atmosphere in the vault before he entered because he did not think it was hazardous.

Carl Nichols, a certified court reporter, testified to certain statements made by Lon Hoover approximately one year after the accident. At that time, Mr. Hoover apparently stated that on several occasions pumphouses similar to the one here would accumulate gas and explode when an electrical arc from the pump was generated. Hoover also stated that he believed his comments to Johnson's predecessor regarding igniting the water in the well made it "very clear there was a gas hazard in it."

George Neely, a retired water well driller, testified by way of evidence deposition. Mr. Neely drilled the deep well in the early 1960's because the old shallow well "wasn't fit to use." Neely connected the deep well to the water tank in the shallow well pit by running an electrical wire from the deep well pump to the pit. He also installed the pressure switch and pump controls. However, none of these installations were present in the photographs of the well pit taken right after the explosion.

Neely had no knowledge of methane gas in the area when the deep well was constructed, but later learned of its presence in various areas in northern Illinois. He stated that when asked to drill in these areas it was his custom to verbally communicate to the owner the presence of such hazardous gas. It was also his practice to adequately vent the area.

Elizabeth Butero testified that NRC had an ongoing business relationship with Hoover with regard to repair and maintenance of the deep well. She testified that she did not recall Hoover ever recommending modification of the vault to provide for ventilation. She received a proposal from Hoover stating that an above-ground pumphouse should be constructed to replace the vault, but the proposal did not suggest there was a methane gas problem in the pit. Hoover did not recommend that explosion-proof equipment be used in the vault, nor did Hoover ever warn against smoking or any type of spark in the vault. Mrs. Butero was never aware of a methane gas problem.

Michael Butero testified that he had never heard of methane gas in the area. The day after the explosion, Lon Hoover told him it was common knowledge in the area that there was gas in shallow pits like the one at NRC. He testified that he had never looked at the electrical controls in the pit before the accident. The day after the accident he saw that the motor controls for one of the well pumps were wired up on a temporary basis. The witness had seen spent matches and cigarettes on the floor of the pit before the explosion.

Defendant first claims the jury's finding that Johnson was negligent, but that his negligence was not a proximate cause of his injuries, is against the manifest weight of the evidence. Hoover argues that the evidence shows that Johnson's negligence was the striking of a match while in the pit, and that this negligent act was the proximate cause of the explosion.

The court instructed the jury on several theories of Johnson's possible negligence: that he carelessly worked alone in the vault; that he carelessly failed to exhaust the gases from the vault before entering; that he struck a match to light his pipe in the vault when he knew or

should have known that it was unsafe to do so.

"A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly apparent or the findings appear to be unreasonable, arbitrary, and not based on the evidence." (*Wilson v. Don LaCost, Inc.* (1974), 20 Ill. App. 3d 624, 628, 314 N.E.2d 27, 30.) If there is sufficient evidence to support at least one of the theories upon which a complaint is based, then the verdict conforming with that theory will not be set aside. *Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106; Ill. Rev. Stat. 1979, ch. 110, par. 68(4).

■■ In their argument Hoover assumes the finding that Johnson was negligent was a finding that Johnson negligently struck a match. On the verdict form, however, the jury did not state in what manner it found Johnson negligent. The evidence at trial would support findings that Johnson was negligent with respect to any of a number of acts or omissions. Not all such negligent acts would be a proximate cause of Johnson's injury. The failure to have a helper nearby, for example, may have been considered by the jury to be negligence, but such negligence would not be the proximate cause of the injury. Johnson would have been burned regardless of whether he had a helper. Although Hoover's witnesses testified they thought the explosion was caused by the striking of a match, there was also evidence to support a finding that Johnson did not negligently strike a match. We cannot conclude the jury's finding that Johnson was negligent but that his negligence was not a proximate cause of his injury was "clearly and palpably contrary to the manifest weight of the evidence." *Stephenson v. Dreis & Krump Manufacturing Co.* (1981), 101 Ill. App. 3d 380, 383, 428 N.E.2d 190, 192.

Hoover next argues it was error for the court to give plaintiff's instruction No. 15 (court's instruction No. 2), which states that the plaintiff Johnson alleged Hoover was negligent in one or more of the following ways:

"Failed to adequately vent the well pit when defendant knew or should have known that explosive methane gas could accumulate in the pit creating a hazard;

Failed to install an explosion-proof motor in a well pit when they knew of a potential methane gas hazard in the pit;

Negligently hooked up temporary exposed electric wiring in the well pit when they knew of a potential methane gas hazard in the pit;

Failed to warn plaintiff or his employer of the presence of methane gas in the shallow well and pit when they knew of

such a presence and the resulting dangerous condition;
Failed to warn plaintiff or his employer of the danger of any machine sparks or other flame in the area of the well pit."

Hoover contends that it had no right, power, or authority to do the things in the first three paragraphs of the instruction (ventilating the pit and installing explosion-proof equipment), and that it therefore had no legal duty to perform these acts. (See *Pearson v. Ford Motor Co.* (1975), 32 Ill. App. 3d 188, 336 N.E.2d 528.) Hoover concludes that the instruction was improperly given to the jury, and that this error now requires reversal of the judgment against it.

To recover on a theory of common law negligence there must first exist a duty or obligation requiring one to conform to a certain standard of conduct for the protection of another against an unreasonable risk. (*Barnes v. Washington* (1973), 56 Ill. 2d 22, 305 N.E.2d 535.) Whether a duty exists is a question of law to be determined by the court, but whether the duty is properly performed by the defendant is a fact question to be decided by the trier of fact. *Barnes v. Washington; Marshall-Putnam Farm Bureau, Inc. v. Shaver* (1973), 12 Ill. App. 3d 402, 299 N.E.2d 10.

■ In the present case, the jury was instructed that the defendant had a duty, before and at the time of the occurrence, to use ordinary care for the safety of the plaintiff and his property. Defendant did not object to this instruction and did not contend that it owed no duty of ordinary care to the plaintiff with respect to this occurrence. Hoover's contention is that it had no specific duty to ventilate the pit or to install explosion-proof equipment. We think that the question of the defendant's obligation to ventilate and/or install explosion-proof equipment is a question of the proper performance of defendant's broader duty to exercise ordinary care under these circumstances and as such was properly submitted to the jury. *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253.

The jury was instructed on five theories of negligence, each of which was supported by the evidence. The record discloses that defendant Hoover selected the equipment to be installed in the water wells it serviced. It, therefore, had the power and authority to select equipment which would be most suited for use in the shallow well pit. Given Hoover's knowledge of methane gas in the area, and its probable existence in the shallow-well pit itself, it assumed the duty of ordinary care in selecting and installing proper equipment for use in the well. Thus, the failure to install an explosion-proof pump and the failure to use insulated wiring could constitute negligence under the circumstances here. Similarly, the record reveals that it is good engi-

neering practice, and even the custom in the well industry, to ventilate a well pit known or suspected to contain combustible gases. (See *Darling v. Charleston Community Memorial Hospital* (1965), 33 Ill. 2d 326, 211 N.E.2d 253.) According to plaintiff's expert, Hoover was required by the Illinois Water Well Code to provide for the release of accumulated gases from the well. Given this evidence, the jury could conclude that Hoover had knowledge that the well pit should have been vented, but that it nevertheless proposed to, and in fact did, reactivate the well without this necessary ventilation. We believe the jury could conclude from Hoover's failure to vent the well a breach of its duty of ordinary care under these circumstances.

We find unpersuasive defendant's claim that ventilation of the well pit would have required modification of the concrete well structure itself, which Hoover claims it had no authority to do. The record is clear that adequate ventilation could have been achieved merely by replacing the solid steel vault cover with an open grated manhole cover which we do not believe, given Hoover's authority to select appropriate equipment, would have required special express authority from NRC. This method of ventilating would have required no modification of the concrete structure itself, and would have provided Hoover with a cost-effective means of protecting against the known risk of explosion.

█ In returning its finding of negligence against the defendant, the jury did not specify on what theory its finding was based. Hoover challenges only three of the five theories submitted; it does not deny that it had a duty to warn NRC of the methane gas hazard in the well pit. Nor does it claim that the general finding of negligence is against the manifest weight of the evidence. The record is replete with evidence that Hoover failed to warn NRC of the hazard of methane gas in the well. Hoover's president himself admitted that he could not recall ever telling NRC's owner or her son of such a hazard. It is well settled that a verdict on two or more theories will not be set aside if there is sufficient evidence to support at least one of the theories. (*Moore v. Jewel Tea Co.* (1970), 46 Ill. 2d 288, 294, 263 N.E.2d 103, 106; Ill. Rev. Stat. 1979, ch. 110 par. 68(4).) Furthermore, had the defendant desired to ascertain upon which theory the jury based its finding, it could have done so by submitting a separate interrogatory as to each theory. (See *Moore*; Ill. Rev. Stat. 1979, ch. 110, par. 65.) We, therefore, believe there was sufficient evidence to support the general finding of negligence by the defendant under the facts presented here. We find no error in the giving of plaintiff's instruction 15 which would require reversal of the judgment against Hoover.

■ We note that Hoover argues for the first time in his reply brief that a contractor's liability for negligent acts ends when his work product is accepted by and returned to the control of the employer. (*Healey v. Heidel* (1918), 210 Ill. App. 387.) This point will be considered waived (*Coons v. Wilder* (1981), 93 Ill. App. 3d 127, 416 N.E.2d 785), and in any event, *Healey* does not apply where, as here, there is no evidence that NRC ever accepted, or even inspected, Hoover's work. Further, the record is clear that the gas hazard in the vault would not have been apparent to NRC even upon inspection.

Defendant also contends that the trial court erred in overruling Hoover's objection to a question asked of Edward McLain, the plaintiff's expert witness. McLain was asked the following question:

"Mr. McLain, in reviewing the Illinois Water Well Code, are there any particular requirements regarding venting by a water well of pits where toxic gases may be suspected?"

The witness answered, over objection, that "[t]here is such a requirement *** [t]hat all vents be of adequate size to vent the well."

■ Hoover's argument on this issue returns to its earlier contention that it had no duty to vent the pit. Hoover objected on the ground that there was no evidence that the well was not ventilated and that the question improperly suggested to the jury that Hoover had a duty to vent the well pit when it did not. Hoover concludes that the question thereby prejudiced its right to a fair trial. The trial court overruled Hoover's objection finding that the question had relevance to issues raised in the pleadings regarding Hoover's duty to warn that the pit should be ventilated and regarding the question of whether Hoover was negligent in activating a pit that is known to violate code standards.

Hoover's argument seems to rely on the distinction between ventilation of the well itself and ventilation of the well pit which is located above the well. Hoover claims that the code applies only to the ventilation of the well head itself when it is first constructed and which the evidence reveals may have been properly done. However, there was evidence that the well vents were for the general purpose of releasing accumulated gases from the entire well system and not solely the well head. Further, according to plaintiff's expert, the code applies to the installation of a pump as well as the construction of a well. Hoover and his attorney admitted that it was Hoover who installed the pump when the shallow well was activated. Thus, the question regarding code requirements of venting had some probative weight tending to prove some fact in issue; *i.e.,* whether Hoover had knowledge that such a pit should be ventilated. The determination of the admissibility

of evidence rests primarily in the discretion of the trial court and its decision will be reversed only where that discretion clearly has been abused. (*Country Mutual Insurance Co. v. Adams* (1980), 85 Ill. App. 3d 501, 407 N.E.2d 103.) We cannot find such an abuse of discretion here.

Hoover next argues the trial court erred in not striking the testimony of court reporter Nichols regarding statements made by Lon Hoover after service of summons on the defendant and prior to Hoover's answer to plaintiff's complaint. Hoover argues that the taking of the statements was tantamount to the taking of a discovery deposition in violation of Supreme Court Rules 201(d) and 206(a) (73 Ill. 2d R. 201(d), 206(d)). Those rules require prior notice and prohibit the taking of depositions prior to the time all defendants are required to appear. Hoover also contends the statements were taken in violation of Rule 7—104 of the Illinois Code of Professional Responsibility (85 Ill. 2d R. 7—104), which prohibits attorneys from communicating with a party known to be represented by an attorney without first obtaining the consent of that party's attorney. Relying on *Bruske v. Arnold* (1969), 44 Ill. 2d 132, 254 N.E.2d 453, defendant concludes that the statements should have been excluded from evidence on the basis of these violations and that failure to do so necessitates a new trial.

Initially, we note that the defendant failed at the time the testimony was introduced to object to it on the grounds specified above. The only objections made at that time were that the statements were not impeaching and did not constitute admissions against Hoover's interest. These objections were overruled by the court. However, after the plaintiff rested his case the defendant moved that the testimony be stricken on the ground urged here on appeal. The trial court denied the motion because Hoover had no supporting authority.

■ An objection to evidence must be timely made and must specify the reasons for the objection. (*People v. Trefonas* (1956), 9 Ill. 2d 92, 136 N.E.2d 817.) Generally, an objection to the admission of evidence in order to be timely must be made at the time of its admission. (*Foster v. Englewood Hospital Association* (1974), 19 Ill. App. 3d 1055, 313 N.E.2d 255.) In *People v. Driver* (1978), 62 Ill. App. 3d 847, 379 N.E.2d 840, the court held that a motion to strike testimony by defendant made at the close of the case was dilatory, not made in apt time, and thus waived. The motion to strike here was made after the close of plaintiff's case, not after the close of the entire case. Still, we find the motion was not made in apt time and is now waived.

The fact that other objections were made at the time the testi-

mony was offered does not satisfy the requirement of a timely objection or motion. An objection to evidence based upon a specific ground is a waiver of objection on all grounds not specified. *People v. Pruitt* (1974), 16 Ill. App. 3d 930, 307 N.E.2d 142.

Even if this issue were not waived and the admission of the testimony were somehow error, we do not see how the defendant was prejudiced. Nichols' testimony was offered as tending to prove Hoover's prior knowledge of methane gas in the area, a fact which was already established by other independent evidence. (See *People v. Horton* (1973), 14 Ill. App. 3d 957, 304 N.E.2d 21.) Moreover, Hoover had ample opportunity to cross-examine Nichols regarding the circumstances surrounding the statements, and to offer its own evidence as to Hoover's prior knowledge and notice to NRC. We note, again, that Hoover does not contest the general finding of negligence against it. We, therefore, find that the admission of Nichols' testimony, even if error, is not reversible error under the facts of this case.

Hoover's next contention is that he was unduly prejudiced by comments made by plaintiff's counsel during closing argument to the jury. The closing arguments were not transcribed but the trial judge, pursuant to Supreme Court Rule 323(c) (73 Ill. 2d R. 323(c)), certified that the comments objected to by Hoover were stated by Johnson's counsel.

The court related the pertinent parts of the argument. Plaintiff's counsel stated, "You, as jurors in Lake County, have an opportunity to make sure that this can never happen again in Lake County, this should not go unpunished." Hoover objected to the comment on the ground there was no punitive damages claim. The court sustained the objection and instructed the jury to disregard the remark. Plaintiff's counsel then stated, "You are the conscience of the community. You have an opportunity to right a wrong." No objection was made to this.

It is improper to appeal to a jury to punish a party by the size of the verdict when punitive damages are not prayed for. Hoover cites *Chicago Union Traction Co. v. Lauth* (1905), 216 Ill. 176, 74 N.E.738, and *Chicago City Ry. Co. v. Math* (1904), 114 Ill. App. 350, apparently as authority that whenever punitive damages are mentioned in argument in cases where they are not prayed for and may not be awarded, reversal on appeal is required, even if objection is not made at the time the remark is made. *Chicago Union Traction Co.* involved a plaintiff arguing to the jury that they should award punitive damages. Defense counsel objected but the trial court overruled the objection each time it was made. The last time plaintiff's counsel men-

tioned punitive damages defense counsel did not object. The supreme court held that the failure to object the last time did not waive the issue, for the court had already ruled on the matter. The supreme court then held that the trial court had ruled incorrectly and that because the jury was led to believe it could award punitive damages, reversal was necessary.

In *Chicago City Ry. Co. v. Math* (1904), 114 Ill. App. 350, 354, plaintiff's counsel argued to the jury in language that was "inflammatory and strongly calculated to deprive the jurors of that calmness of judgment and freedom from passion and prejudice which should mark and permeate their deliberations." Counsel there argued that: " 'There is no recompense that can in any way compensate a father or a parent for the loss of a child. *** There is no money, nothing under the sun *** that can recompense a father for the loss of his only son.' " An objection to this was overruled. Counsel further stated that the jury could determine an award "as a punishment" to the defendant. No objection to this was made. The effect of the argument and ruling by the court, therefore, was to tell the jury it could award punitive damages.

Such was not the effect of the argument here. Unlike the court in the cases cited by Hoover, the court here cured the error by instructing the jury to disregard the improper statement. (See *Brandel v. Yellow Cab Co.* (1981), 98 Ill. App. 3d 88, 423 N.E.2d 1237.) The jury thus learned from the trial court that to punish was not an element of their duty in assessing damages. Further, the court instructed the jury as to the specific factors to consider in assessing damages. Punitive damages were not alluded to in the instructions. It must be presumed that the jury followed the instructions of the trial court. *Carlson v. Dorsey Trailers, Inc.* (1977), 50 Ill. App. 3d 748, 365 N.E.2d 1065.

The cases cited by Hoover do not require automatic reversal whenever punitive damages are improperly mentioned at trial. The court in *Chicago Union Traction Co.* stated:

"[A]lthough the trial court may have done its full duty in its supervision of the trial and in sustaining objections, a new trial should be granted where it appears the abuse of argument has worked an injustice to one of the parties." 216 Ill. 176, 183-84, 74 N.E.738, 740.

██ More recently the court in *Manninger v. Chicago & Northwestern Transportation Co.* (1978), 64 Ill. App. 3d 719, 730, 381 N.E.2d 383, 391, stated:

"[W]here prejudicial arguments or improper conduct of counsel affect the case to the extent that the litigants cannot receive a

fair trial and the judicial process suffers deterioration, this court may consider such an assignment of error even though no objection was made and no ruling was made or preserved thereupon by court or counsel."

Here one comment was objected to and the court sustained the objection and instructed the jury to disregard the remark. The second comment was not objected to, nor was a mistrial requested by defense counsel. (See *Gaffner v. Meier* (1948), 336 Ill. App. 44, 82 N.E.2d 818.) Finally, these statements were brought to the attention of the trial judge in defendant's post-trial motion for a new trial, and the court ruled that the statements did not constitute prejudicial error. The trial court's ruling is given great weight since it is in the unique position of hearing the testimony and arguments, and calculating the effect these matters have on the jury. (*Grieg v. Griffel* (1977), 49 Ill. App. 3d 829, 844, 364 N.E.2d 660, 671.) We are unable to conclude that the trial court abused its discretion in this regard.

Next defendant appeals the trial court's refusal to instruct the jury that personal injury awards are not subject to income taxes. He cites *Norfolk & Western Ry. Co. v. Liepelt* (1980), 444 U.S. 490, 62 L. Ed. 2d 689, 100 S. Ct. 755, to support his argument. In *Liepelt*, a case arising out of Illinois, the United States Supreme Court held that a trial court may not refuse an instruction on the tax consequences of a personal injury award in actions arising under the Federal Employer's Liability Act (FELA). 45 U.S.C. sec. 51 *et seq.* (1976).

■ The Illinois Supreme Court has ruled that it is not error to refuse to instruct the jury as to the taxability of an award. (*Raines v. New York Central R.R. Co.* (1972), 51 Ill. 2d 428, 283 N.E.2d 230; *Hall v. Chicago & Northwestern Ry. Co.* (1955), 5 Ill. 2d 135, 125 N.E.2d 77.) Defendant argues that the *Liepelt* decision overrules these cases since they are also FELA cases. We agree that *Hall* and *Raines* have been overruled by *Liepelt* with respect to Illinois cases arising under the FELA. However, the *Liepelt* decision does not, and could not, change the Illinois rule in purely State matters where, as here, no Federal issues are involved. We, therefore, find *Hall* and *Raines* still controlling here and accordingly find no error in the ruling of the trial court. Accord, *Newlin v. Foresman* (1982), 103 Ill. App. 3d 1038, 432 N.E.2d 319; *In re Air Crash Disaster* (N.D.Ill. 1981), 526 F. Supp. 226.

■ Defendant next argues it was an abuse of discretion for the trial court to refuse to let the *curriculum vitae* of defendant's expert witness go to the jury room after it had been admitted into evidence. Under section 67(4) of the Civil Practice Act, "Papers read or re-

ceived in evidence, other than depositions, may be carried from the bar by the jury." (Ill. Rev. Stat. 1979, ch. 110, par. 67(4).) Under this provision the trial judge has considerable discretion as to the exhibits which may be taken to the jury room. (*Wetherell v. Matson* (1977), 52 Ill. App. 3d 314, 367 N.E.2d 472.) When Dr. Torda took the stand, he was extensively questioned on his professional career by Hoover's attorney. The testimony by Dr. Torda about his career revealed he was a highly educated and knowledgeable engineer. We cannot say, therefore, that it was an abuse of discretion not to send the *curriculum vitae* to the jury room.

Hoover's last two contentions concern its third-party action against NRC for contribution and indemnity. The court dismissed the contribution count, finding that contribution is only allowed by statute in cases where the injury occurred on or after March 1, 1978. The injury here occurred on June 7, 1977. The indemnity count was tried and the jury found for NRC.

"An Act in relation to contribution among joint tortfeasors" states that it applies to "causes of action arising on or after March 1, 1978." (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*; hereinafter referred to as the contribution statute.) Hoover argues that the date of the injury does not determine when the cause of action arises under the act. Hoover asserts the relevant date is either when payment of the judgment occurs or "at a time when it is reasonable to assume that a right of contribution is easily ascertainable, for example, after the filing of plaintiff's lawsuit." Hoover contends that both policy and the contribution statute itself mandate this conclusion.

Hoover argues policy by discussing the new comparative negligence rule in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886. The policy evident in *Alvis*, Hoover argues, is that a party should be responsible for his negligence only to the degree of his fault. As the *Alvis* rule of comparative negligence was directed to apply to cases "tried on or after June 8, 1981," Hoover argues that an anomaly is created if contribution may apply only to cases where the injury-causing occurrence was before March 1, 1978. He asserts that the policies of comparative negligence and contribution share the goal of apportioning responsibility fairly and to permit such a discrepancy in the effective dates of the two doctrines would be unfair.

While there is a common thread in the policy behind the two doctrines, we do not agree with Hoover that either policy or statutory construction require the conclusion that March 1, 1978, applies to the date of payment of the judgment, rather than the date of the occurrence. While the fair apportionment of responsibility is a policy com-

mon to both the rules, each rule was designed for a different purpose. Comparative negligence was adopted to permit a contributorily negligent plaintiff to seek redress for an injury caused by another's negligence. Contribution, on the other hand, was designed only to permit partial recovery by one tortfeasor from another tortfeasor of the judgment it must pay to the injured party. Here, Hoover is not an injured plaintiff seeking redress for an injury to it caused by NRC's negligence. Further, the Illinois Supreme Court in *Alvis* referred to contribution as a "collateral issue" and stated that that issue had been resolved under the principles announced in *Skinner v. Reed-Prentice Division Package Machinery Co.* (1978), 70 Ill. 2d 1, 374 N.E.2d 437, and in the contribution statute (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*). (85 Ill. 2d 1, 28, 421 N.E.2d 886, 898.) Given these statements by our supreme court, we see no reason to find the rule in *Alvis* anomalous to the rule announced in *Skinner*. (Accord, *Verson Allsteel Press Co. v. Major Spring & Manufacturing Co.* (1982), 105 Ill. App. 3d 419, 434 N.E.2d 456.) The rules were arrived at separately, in two separate supreme court decisions, and there is not suggestion in either case that one rule compels the existence of the other. They, therefore, need not have the same effective dates. These rules were created by separate courts which had authority to set their effective dates.

In *Skinner v. Reed-Prentice Division Package Machinery Co.* the doctrine of contribution was given prospective application to "causes of action arising out of occurrences on and after March 1, 1978." (70 Ill. 2d 1, 17, 374 N.E.2d 437, 444.) The legislature then codified the court decision in the contribution statute (Ill. Rev. Stat. 1979, ch. 70, par. 301 *et seq.*), stating that the act applies to "causes of action arising on or after March 1, 1978." Thus, the language in the statute differs from the language in *Skinner* in that in the statute the words "out of occurrences" do not follow the word "arising."

Several recent Illinois appellate court decisions have discussed a tortfeasor's right of contribution from a joint-tortfeasor where the tort was committed before March 1, 1978, but the right of contribution had not "ripened" until after that date. In *Verson Allsteel Press Co. v. Major Spring & Manufacturing Co.* (1982), 105 Ill. App. 3d 419, 434 N.E. 2d 456, the tortfeasor seeking contribution argued that a cause of action for contribution arises when the judgment is paid, which in that case was after the effective date of March 1, 1978. The underlying tort in *Verson* was committed before that date. Following an extensive discussion of the effective date of the statute, the *Verson*

court concluded that the omission of the words *"out of occurrences"* in the statute, does not preclude a determination that the underlying tort must occur on or before March 1, 1978. (105 Ill. App. 3d 419, 420.) Following an analysis of the legislative history of the statute, the court stated:

"If we were to adopt the construction of section 301 urged by Verson, the effective date of March 1, 1978, would become wholly arbitrary. If the cause of action for contribution 'arises' when a judgment is paid, the statute's compass is far broader than *Skinner*'s and the fact that the statute and the decision designate the same effective date—March 1, 1978—would be meaningless. Given the statute's unquestionable kinship with the *Skinner* decision and given the legislature's expressed intent to follow the case, we hold that the statute applies to causes of action for contribution arising out of torts committed on and after March 1, 1978." 105 Ill. App. 3d 419, 422, 434 N.E.2d 456, 459.

We find the reasoning of the *Verson* court persuasive. While it might be neater, and perhaps more convenient, to have the same effective dates for contribution and comparative negligence, there is no legal reason for this to be so. (Accord, *Balmes v. Hiab-Foco, A.B.* (1982), 105 Ill. App. 3d 572, 434 N.E.2d 482; *Harris Trust & Savings Bank v. Ali* (1981), 100 Ill. App. 3d 1, 425 N.E.2d 1359, *appeal denied* (1982), 88 Ill. 2d 550.) Accordingly, defendant's third-party complaint for contribution from NRC was properly dismissed since the occurrence in the present case took place before March 1, 1978.

Hoover finally asks this court to enter judgment notwithstanding the verdict on the indemnity claim against NRC, claiming that the verdict in favor of NRC is against the manifest weight of the evidence.

We note initially that a judgment notwithstanding the verdict should be entered "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

The theory of implied indemnity serves to shift the liability from a defendant in a negligence action to a third party who was also at fault.

"Third-party indemnity is allowed to a tortfeasor whose misconduct is passive in comparison to the misconduct of another tortfeasor whose wrongdoing can be characterized as active

and the primary cause of the plaintiff's injuries. (*Harris v. Algonquin Ready Mix, Inc.* (1974), 59 Ill. 2d 445, 322 N.E.2d 58; *Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161.) Before indemnification will be permitted there must be a qualitative distinction between the negligence of the two tortfeasors. (*Lindner v. Kelso Burnett Electric Co.* (1971), 133 Ill. App. 2d 305, 273 N.E.2d 196.) However, indemnification will not be granted when the first tortfeasor is actively negligent despite the active negligence of the other tortfeasor. (*Goodrick v. Bassick Co.* (1978), 58 Ill. App. 3d 447, 374 N.E.2d 1262; *Hanson v. Cresco Lines, Inc.* (1978), 57 Ill. App. 3d 168, 372 N.E.2d 936.) The issue of active-passive negligence and the imposition of third-party indemnity is a question of fact for the jury. *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 338 N.E. 2d 868." *Zizzo v. Ben Pekin Corp.* (1979), 79 Ill. App. 3d 386, 398, 398 N.E.2d 382, 391.

Hoover argues that NRC's failure to discover and identify the presence of glacial drift gas and to take steps to eliminate that hazard constituted active negligence, and that its own negligence must be considered passive in comparison. NRC, on the other hand, argues that Hoover's conduct in failing to warn NRC of the presence of hazardous gas, in instructing plaintiff Johnson to manually bleed air from the water tank, and in reactivating an unsafe well, all constituted active negligence. NRC further claims that there is a lack of evidence of a qualitative difference in the conduct of Hoover and NRC which would render NRC's conduct active and Hoover's conduct passive.

"[T]here are no clear-cut guidelines as to what constitutes active or passive negligence." (*Richard v. Illinois Bell Telephone Co.* (1978), 66 Ill. App. 3d 825, 851, 383 N.E.2d 1242, 1262.) Usually, a party is considered actively negligent " 'if he participates in some manner in the conduct or omission which caused the injury.' " (*Sargent v. Interstate Bakeries, Inc.* (1967), 86 Ill. App. 2d 187, 193, 229 N.E.2d 769, 772.) However, a party who is totally immobile may be regarded as actively negligent. (*Moody v. Chicago Transit Authority* (1974), 17 Ill. App. 3d 113, 307 N.E.2d 789.) Generally, one is viewed as only passively negligent if he breaches a duty of care imposed upon him but does not actively participate in an act or omission. (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 305 N.E.2d 161; *Chapel v. Thompson* (1977), 56 Ill. App. 3d 548, 372 N.E.2d 95; *Sargent v. Interstate Bakeries, Inc.*) The court in *Sargent* set forth the following definitions of active and passive negligence:

" 'Passive negligence exists where one person negligently

brings about a condition or an occasion and active negligence exists where another party negligently acts upon that condition and perpetrates a wrong.' " (86 Ill. App. 2d 187, 192-93, 299 N.E.2d 769, 772, quoting *Southwestern Greyhound Lines, Inc. v. Crown Coach Co.* (8th Cir. 1949), 178 F.2d 628.)

Finally, the court in *Cunag v. McCarthy* (1963), 42 Ill. App. 2d 36, 191 N.E.2d 404, found that the defendant's failure to warn of the dangerous characteristics of a tractor, even if not active negligence itself, could constitute active negligence when coupled with the affirmative conduct of directing the plaintiff into a dangerous area.

The threshold determination here is whether under the evidence most favorable to NRC, defendant Hoover's conduct constituted active negligence. If it did, Hoover's motion for judgment notwithstanding the verdict was properly denied by the trial court, since one who is actively negligent has no right to indemnification regardless of whether the proposed indemnitor is active or passive. *Chapel v. Thompson* (1977), 56 Ill. App. 3d 548, 372 N.E.2d 95.

■ Viewing the evidence most favorable to NRC, we conclude that the conduct of defendant Hoover in this case constituted active negligence. The evidence shows that Mr. Hoover was a civil engineer and a licensed water well and pump contractor in Illinois. Hoover had knowledge of the presence of methane gas in the area, and Mr. Hoover himself had suspicions that methane was present in the shallow-well pit. Despite this, Hoover failed to warn NRC of the danger, and even proposed that NRC activate the shallow well for use as an emergency water source. Hoover did in fact activate the well on five or six previous occasions using uninsulated wiring and a nonexplosion-proof pump to accomplish this. Thus, Hoover performed certain affirmative acts which it knew or should have known would add to the already hazardous condition of the pit. In addition to these acts, there was evidence that Hoover instructed plaintiff Johnson on the procedure for manually bleeding air from the water tank, a procedure which in the opinion of several experts led to the explosion of the pit. All of these affirmative acts were done with the knowledge that not only its own employees but also NRC's employees would occasionally be working in the vault. In view of all this evidence, we conclude that Hoover's conduct in failing to warn NRC of the dangerous condition of the pit, when coupled with the affirmative acts of installing uninsulated wiring and nonexplosion-proof equipment, and of instructing plaintiff Johnson on the manual procedure to "bleed" the water tank, constituted active negligence.

We note that the jury was instructed that in its indemnity action

against NRC, Hoover had the burden of proving: (1) that it was free from major fault; and (2) that NRC's conduct was a major fault in causing plaintiff Johnson's injuries. The jury returned its verdict against Hoover, finding that in one or more respects Hoover failed to meet its burden of proof against NRC. Having determined that Hoover was actively negligent, and therefore not free from major fault, we conclude that the jury's verdict was not against the manifest weight of the evidence, and Hoover's motion for judgment notwithstanding the verdict was properly denied by the trial court.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

NASH and REINHARD, JJ., concur.