HARRY E. HANSON, Plaintiff-Appellee, *v.* CRESCO LINES, INC., *et al.*, Defendant-Appellee and Cross-Appellant.—(BRIGHTON-KRUG-WESTERN *et al.*, Defendants-Appellants and Cross-Appellees.)

First District (1st Division)   No. 76-654

Opinion filed January 17, 1978.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Leonel I. Hatch, Jr., and Stanley J. Davidson, of counsel), for appellants.

B. John Mix, Jr., and John T. Mead, both of Chicago, for appellee Harry E. Hanson.

William D. Maddux, Ltd., of Chicago (Raymond R. Cusack and Jerald A. Kessler, of counsel), for appellees Cresco Lines, Inc., and Elgia L. Trotter.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Harry E. Hanson (plaintiff) sustained personal injuries when a truck owned by Cresco Lines, Inc. (Cresco) and driven by Elgia L. Trotter (Trotter) collided with plaintiff's automobile on October 11, 1973, at a point on the Northwest Tollway under construction by Brighton-Krug-Western, a joint venture (Brighton). Plaintiff sought damages from Cresco, Trotter, Brighton and Ozea Peters (Peters), a flagman who directed traffic at the accident site. Cresco and Trotter filed a counterclaim against Brighton and Peters seeking indemnity on an active-passive theory. Motions by Brighton and Peters for directed verdicts at the close of the evidence presented by both plaintiff and Cresco and Trotter were denied. The jury returned a verdict for plaintiff in the amount of $75,500 against all four defendants and found in favor of Brighton and Peters on the counterclaim filed by Cresco and Trotter. Post-trial motions filed by all defendants for judgment notwithstanding the verdict or a new trial were denied. Brighton and Peters have appealed, with a cross-appeal by Cresco and Trotter.

Brighton and Peters contend the trial court erred in denying their motion for judgment n.o.v. as plaintiff failed to establish any negligence on their part and Trotter's negligence was the sole, proximate cause of the collision; alternatively, they urge they are entitled to a new trial on the theory that the verdict was contrary to the manifest weight of the evidence and their case was prejudiced by submission of the counterclaim to the jury. With respect to the verdict for plaintiff, Cresco and Trotter maintain that they are entitled to judgment n.o.v. as plaintiff failed to establish Trotter's negligence; they also request judgment n.o.v. on the counterclaim because any negligence on their part was passive while Brighton and Peters were the active tort-feasors.

During October 1973 the Northwest Tollway was being widened and repaired by expansion from a 4 lane highway into 6 lanes. The new lanes

were being paved over the median strip. Brighton was the general contractor. On October 11, 1973, concrete was being poured into the new inner lane for the eastbound half of the tollway on a section some 20 miles east of Elgin, Illinois. The original left-hand lane of the eastbound half was completely blocked off from the right-hand lane by yellow barricades placed between these lanes at 100 foot intervals. This permitted concrete trucks and pavers to use the left-hand lane for parking and working. The right-hand lane and shoulder remained open for eastbound traffic. A white line separating them had been painted. Signs at the first exit east of Elgin warned motorists to use this area with trucks to use the left portion (actually the right-hand lane). The 70 m.p.h. speed limit, then in force, was reduced to 50 m.p.h. for this area.

Concrete trucks parked in the blocked-off lane (the original left-hand lane) would intermittently be required to enter the area to the right being utilized by traffic. During these times it would temporarily become necessary to channel all eastbound traffic onto the shoulder of the road.

Trotter testified that he was driving east in a Cresco tractor-trailer truck, 40 feet long, loaded with 40,000 pounds of lumber. He noted a construction zone as he crossed the Fox River near Elgin. In accordance with the sign instructing trucks to use the left of the two open lanes, he proceeded on the tollway's right-hand lane for about 13 miles, until the collision occurred. Traffic was heavy with trucks generally in the right-hand lane, and automobiles were using the shoulder lane to the right of the trucks. It was 5 p.m. on a dry, clear day. Trotter had been following another large truck with a box trailer at a distance of 20 to 30 feet, traveling at about 40 m.p.h. This vehicle turned on its right turn signals. Trotter activated his own right turn signals for about 200 to 300 yards before beginning the lane change.

Trotter testified that he checked his rearview mirrors, saw a clear lane to his right, and, as the truck in front began the lane change, he too proceeded to go over into the shoulder lane. At this point his truck was 10 to 15 feet behind the other trailer, traveling at a speed of 30 to 35 m.p.h. At this time, he became aware of a flagman approximately 50 feet in front of him in the right-hand lane, standing 6 to 10 feet in front of a concrete truck and signalling all traffic onto the shoulder to the right. As his truck began the lane change, the wheels of his trailer came into contact with plaintiff's automobile, causing it to be pushed against the guardrail bordering the shoulder. The vehicle in front of Trotter cleared the flagman and the stopped concrete truck. Trotter brought the Cresco truck to a stop in the shoulder lane about 25 to 30 feet east of, or beyond, the flagman.

On cross-examination Trotter testified there was a "blind spot" in his vision, while driving the Cresco truck, almost directly to his right. He did

not see plaintiff's automobile when he checked his rearview mirrors. For some 200 to 300 yards he knew the truck in front was going to turn onto the shoulder and that he would be following regardless of whether he saw a flagman. He estimated he was traveling 30 to 35 m.p.h. at the time of the collision but indicated that "at the most" he was going 40 m.p.h.

Peters, the flagman, testified that he was substituting for the regular flagman who was on a break. However, he had worked as a flagman on other occasions for long periods of time. He was directing traffic onto the shoulder because concrete trucks were using the left-hand portion of the area at that point. He was standing in this left-hand portion about 25 to 30 feet in front of a concrete truck. He was wearing an orange vest and yellow helmet and was waving an orange-reddish flag to direct traffic to slow down and to shift to the shoulder lane. He first saw the Cresco truck 200 to 300 yards west on the highway. He estimated it was traveling about 50 to 60 m.p.h. He noticed the right turn flashers which had been on "for some time." As the Cresco truck approached, it began to move onto the shoulder. Peters first saw the plaintiff's automobile after the collision. The Cresco truck stopped about 25 to 30 feet east of where he was standing. The plaintiff's car stopped some 40 to 50 feet west of his position. He testified there were no cones, extra barricades, signs or other flagmen directing traffic onto the shoulder.

Plaintiff testified he drove eastbound on the shoulder area at 40 m.p.h. for about 5 minutes until the accident. About 8 to 10 trucks passed him in the left lane traveling some 50 m.p.h. He had no time to sound his horn or "back off" as the Cresco truck crossed into his lane. He did not see flashers on the Cresco truck. He estimated the truck was traveling 10 m.p.h. faster than his automobile. At the time of impact the closest automobile ahead of him was approximately 3 blocks away.

Donald Zimmer, acting chief engineer for the Illinois State Toll Highway Authority (Tollway) testified that in October of 1973 he was the Tollway's traffic engineer, responsible for seeing that contract traffic control provisions complied with plans and specifications. It was his function to inspect a construction site daily to ascertain whether the contract plans and documents were properly carried out by the section engineer, also employed by the Tollway.

Zimmer testified that the contract between Brighton and the Tollway for this work contained a section devoted to traffic control. A subsection therein provided that during construction in the median a "type 4" lane closure would be employed. The type 4 plan required that two traffic lanes would remain open, the right-hand lane and the shoulder. The type 4 plan also required posting of signs indicating a 50 m.p.h. speed limit and the use of two lanes, with trucks using the left lane. The plan required barricades along the left of these two lanes spaced at 100-foot intervals. A

separate provision under this plan outlined signs and procedures necessary to close one of these two traffic lanes for repair work or accidents. Zimmer testified that the latter lane closure provision was inapplicable when a flagman was signalling traffic as a temporary matter such as the exit of equipment from the inner lanes. A permanent closure of one lane would cause serious traffic backups. He stated the contract did not require the use of more than one flagman in connection with movement of equipment from the inner lane. He testified that the number and placement of flagmen was within the discretion of the engineer. He referred to a section of the contract calling for "the furnishing of flagmen as required by the engineer * * *." Zimmer also stated it was preferable that a flagman stand within 100 feet of the lane obstruction and to the right, in this case north, of the blocked lane for visibility to approaching traffic.

Gary Marietta, a qualified engineer, testified that he was in charge of enforcing the contract specifications and assuring that traffic control devices were properly in place. He stated he had been at the construction site early in the day. Upon learning concrete trucks would be entering and exiting the area, he instructed the Brighton crew to have a flagman present. He specified that only one flagman was necessary. He testified that more than one flagman could confuse motorists and create problems in signal coordination. In explaining the division of responsibilities between contractor and engineer regarding traffic control, he cited a paragraph of the traffic control section of the Brighton-Tollway contract which required that "[t]he engineer shall inspect the traffic control device placement before work on each stage begins, and any deficiency shall be corrected by the contractor before starting work on that stage." In response to questions regarding the training required of a flagman, Marietta stated that the job requires only a few minutes instruction and that the work entails only slowing traffic down and waving it over.

■■ We turn initially to Brighton and Peters' claim that they are entitled to judgment *n.o.v.* on the basis that the negligent driving of Trotter was the sole proximate cause of the collision. The accepted standard of review for judgment *n.o.v.* requires a determination that all of the evidence, when viewed in the light most favorable to the opponents, so overwhelmingly favors movant that no contrary verdict could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

■■ In our opinion, Trotter's testimony affirmatively establishes his lack of due care in the operation of the Cresco truck during the critical period prior to actual impact. He testified his turn signals were activated for 200 to 300 yards prior to any attempt to change lanes. However, during this preparatory interim, the Cresco truck maintained a speed of at

least 30 to 35 m.p.h., and possibly 40 m.p.h., while following a large semitrailer truck with a box trailer at a distance of only 10 to 15 feet. In our opinion, a driver keeping such close distance behind a large vehicle does not maintain a proper lookout for the safe lane changes necessary in highway driving. (*Glenn v. Mosley* (1976), 39 Ill. App. 3d 172, 175-76, 350 N.E.2d 219.) Trotter's testimony does not reveal any effort by him to increase the distance between the Cresco truck and the vehicle it was following nor any attempt to check for vehicles in the blind spot, he himself noted, during the 20 to 30 second interval prior to beginning the shift to the right into the shoulder lane. See *Leonard v. Pacific Intermountain Express Co.* (1976), 37 Ill. App. 3d 995, 999, 347 N.E.2d 359, *appeal denied* (1976), 63 Ill. 2d 557; *Schmidt v. Dattilo* (1971), 132 Ill. App. 2d 360, 365-66, 270 N.E.2d 236, *appeal denied* (1971), 47 Ill. 2d 592, citing *Hasselbacher v. Mendell* (1970), 119 Ill. App. 2d 90, 255 N.E.2d 484, *appeal denied* (1970), 43 Ill. 2d 397.

Trotter's testimony demonstrates that the driving of the Cresco Truck violated two important statutes of Illinois which were in effect at the time of the occurrence. In section 11—709(a) of the Illinois Vehicle Code (Ill. Rev. Stat. 1971, ch. 95½, par. 11—709(a)), there is a provision that a vehicle shall not be moved from the lane within which it is driving "until the driver has first ascertained that such movement can be made with safety." Section 11—710(a) of the same code provides that, "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." Ill. Rev. Stat. 1971, ch. 95½, par. 11—710(a).

Plaintiff argues that Brighton and Peters were negligent in that Peters was improperly positioned for the signalling process, Peters had received inadequate instruction from Brighton before undertaking the job, Brighton failed properly to warn motorists of the right-hand lane closure, and an insufficient number of flagmen was provided at the critical site. Most of these points were clarified by the testimony of Zimmer and Marietta. They showed that the contract terms were not violated by having only one flagman present during a temporary lane blockage and that in such instances the presence of one flagman was preferred practice. Also the duties a flagman performs require only a few minutes of instruction. In addition, even if a jury were able to find evidence of negligence from any of the above criticisms, none of these factors had any share in causing the accident.

Trotter testified he had determined, independently of any flagman's signals, to follow the other trailer truck into the shoulder lane. He was in the process of that lane change before the flagman and concrete truck

became visible to him. Thus none of the matters in connection with the flagman, his conduct, or the need for additional flagmen could have been a proximate cause of the mishap.

■■ It is legally correct that proximate cause and negligence are both concepts which ordinarily present questions of fact for a jury to decide. (*French v. City of Springfield* (1976), 65 Ill. 2d 74, 79, 357 N.E.2d 438; *Davis v. Marathon Oil Co.* (1976), 64 Ill. 2d 380, 395, 356 N.E.2d 93.) However, "each case must turn on its own facts." (*Davis*, 64 Ill. 2d 380, 395.) In our opinion, all reasonable men would readily agree that the sole proximate cause of the mishap in the case before us was the negligent driving of the Cresco truck. Trotter's own testimony established that he followed too closely behind a huge box trailer which effectively prevented him from keeping a proper lookout and thus seeing the flagman until the vehicle in front of him moved out of his path. This in turn made it necessary hurriedly to leave the lane in which he was traveling so that he did not take precautions required to overcome the admitted "blind spot" in his vision on his right side.

■■ In our opinion the motion of defendants Brighton and Peters for judgment *n.o.v.* should have been allowed. The judgment in favor of plaintiff and against Cresco and Trotter is proper and it is affirmed.

■■ This same reasoning brings us to the conclusion that the judgment in favor of Brighton and Peters on the counterclaim filed by Cresco and Trotter was properly entered. In a situation of this type, "the facts of the case must clearly justify indemnification." (*Carver v. Grossman* (1973), 55 Ill. 2d 507, 512, 305 N.E.2d 161.) Indemnity will generally be granted where the negligence of the indemnitee is passive or secondary and the negligence of the indemnitor has been active or primary. (*Carver*, 55 Ill. 2d 507, 511.) Indemnification will generally not be granted to a party who was actively negligent, regardless of the legal characterizations applicable to the negligence of the other tort-feasor. *Garfield Park Community Hospital v. Vitacco* (1975), 27 Ill. App. 3d 741, 747, 327 N.E.2d 408, *appeal denied* (1975), 60 Ill. 2d 596.

■■ As above shown, Cresco and Trotter vigorously contend that more signs, flagmen, cones channeling the traffic, or barricades would have warned Trotter of the need to change lanes long before the actual crossing took place. All of these matters at best raise only issues of passive negligence. Trotter's extended testimony discussed above, buttressed by Peters' statement that Trotter's turn signals were indeed flashing 200 to 300 yards before the turn and the evidence that the wheels of the trailer portion of the Cresco truck came into contact with plaintiff's automobile in the area of the blind spot of the Cresco driver, are strong and direct evidence of active negligence. It follows that Cresco and Trotter are not

entitled to be indemnified by Brighton and Peters on an active-passive theory. *Moody v. Chicago Transit Authority* (1974), 17 Ill. App. 3d 113, 117, 307 N.E.2d 789.

In light of the conclusions above expressed, we need not reach the other contentions raised by defendants Brighton and Peters. Accordingly the judgment in favor of plaintiff and against Cresco and Trotter is affirmed. The judgment in favor of plaintiff and against Brighton and Peters is reversed. On the cross-appeal, the judgment in favor of Brighton and Peters and against Cresco and Trotter on the counterclaim is affirmed.

Affirmed in part, reversed in part.

McGLOON and JOHNSON, JJ., concur.