Beverly HIGHTOWER, as Administrator of the Estate of Levangelist Hightower, her son, deceased, Plaintiff,

v.

Willie J. HARRIS, Federal Security, Inc., Lillian Loggins and the Chicago Housing Authority, Defendants.

CHICAGO HOUSING AUTHORITY, Cross-plaintiff,

v.

FEDERAL SECURITY, INC., Cross-defendant.

No. 92 C 6438.

United States District Court, N.D. Illinois, Eastern Division.

May 9, 1997.

Kevin Barry Rogers, Kevin, Rogers & Associates, Chicago, IL, for Beverly Hightower.

Edward F. Ruberry, George J. Manos, Bollinger, Ruberry and Garvey, Chicago, IL, for Willie J. Harris, Federal Sec., Inc., Lillian Loggins.

Byron Keith Mason, Robert S. Reda., P.C., Chicago, IL, Phillip Arnold Turner, Peter Joseph Latz, Turner, Latz & Olmstead, Chicago, IL, Chicago Housing Authority.

## ORDER

ROSEMOND, United States Magistrate Judge.

**Procedural Background:** On behalf of her deceased son, Levangelist Hightower, Beverly Hightower, plaintiff, herein, filed a wrongful death suit against two private security guards, Officers Willie J. Harris and Lillian Loggins, a private security company, Federal Security, Inc. (Federal), and a statutorily authorized municipal corporation, the Chicago Housing Authority (CHA). Prior to trial, Harris, Loggins and Federal settled with the plaintiff.[1] On the day of trial, CHA settled.[2] Following settlement, CHA filed a cross-claim against Federal to recover for breach of the protective service contract between them, and indemnity thereunder. Both Federal and CHA moved for summary judgment on the cross-claim. **Federal's motion for summary judgment is granted,** and CHA's motion is denied.

**Statement of Facts:** The underlying case arose *via* plaintiff's charges that two private security guards employed by Federal (Harris and Loggins) unlawfully shot and killed decedent Hightower in a CHA residential building. Plaintiff's Fourth Amended Complaint (Complaint) contained eleven counts. Counts I–VI, X and XI named only Federal, Harris or Loggins while Counts VII, VIII and IX named only CHA. Count VII alleged that CHA violated decedent's civil rights and sought recovery under 42 U.S.C. § 1983. Count VIII alleged that CHA negligently hired, trained and retained Federal as a private security contractor. Count IX sought

injunctive relief for the Count VII § 1983 violations.

CHA and Federal executed a *Protective Service Contract* (Contract) containing the following provision relevant to CHA's cross-claim:

> *Article 8.* The Contractor agrees that prior to the scheduled date of commencing work it will obtain and provide to the CHA and thereafter will maintain in full force and effect, a Certificate of Comprehensive General Liability Insurance issued and written by a company authorized to write insurance in the State of Illinois, and acceptable to the CHA, in the minimum amount of ONE MILLION DOLLARS ($1,000,000.00) per occurrence (including combined single limit bodily injury and property damage liability per each occurrence, including false arrest, false imprisonment) and insuring itself and CHA as an *additional named insured* against any and all losses, claims, damages or injury arising out of any claim involving the providing of or the alleged failure to provide contracted security services or adequate services. (emphasis in original)

> Notwithstanding the providing of such insurance, **Contractor agrees to completely indemnify and hold harmless CHA, its officers and employees, against any liability or expense (including the cost of legal defense and attorneys fees) arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of contractor or its agents in the performance of this contract.**

(emphasis added)

> In the event any claim or action is brought in any court naming the [Chicago Housing] Authority as a defendant or any officer or agent of the Authority as a defendant in connection with a claim involving the providing of or failing to provide security services by Contractor or its agents, the Authority shall, in its sole dis-

---

1. *See,* Minute Order dated July 25, 1994 granting plaintiff's motion to enter order of judgment.

2. *The Chicago Housing Authority's Response Pursuant To Local Rule 12(N) To Federal's Statement* *Of Undisputed Facts Pursuant To Local Rule 12(M)* ¶¶ 35, 36; *Federal Security Inc.'s Response To Chicago Housing Authority's Additional Facts Pursuant To Local Rule 12(N)* ¶¶ 35, 36.

cretion, have the option of appointment of attorneys to defend itself, its employees or agents and the complete cost of that defense, including attorneys fees, shall be paid by the Contractor or by the Contractor's insurance carrier promptly upon any amount becoming due and payable by the CHA upon invoicing by said appointed attorneys to the CHA.

CHA asserts that Federal breached the Contract by failing to secure insurance for CHA covering the period in which decedent was killed. CHA also maintains that Federal must indemnify it for the amount of its settlement with plaintiff and its costs and attorney fees.

### Discussion.

*Summary judgment should be granted* where "the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." [3] The judge is not to consider the weight of the evidence or decide the truth of the matter, but rather should determine whether there is a genuine issue of triable fact.[4] The burden is on the moving party to demonstrate an absence of evidence supporting the non-moving party's case.[5]

*As noted earlier, under the Protective Service Contract between the parties,* Federal agreed to indemnify CHA and hold it harmless against any liability arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of Federal or its agents in the performance of the protective service contract between them. The only

claims remaining for trial were those against the CHA. And these were the only claims that CHA settled. CHA did not contribute any funds to plaintiff's settlement with Federal and its two security guards.

*Whether indemnification is appropriate* will depend upon whether CHA's liability arose out of its own direct negligence or whether it was derived from Federal's negligence. Indemnity will not lie if CHA's liability is due to its own direct negligence since the contract does not provide for such protection. With great deference to our most respected colleague, we conclude that contrary to the analysis set forth in *Smith v. Lyles,* 839 F.Supp. 18 (N.D.Ill.1993) (Judge Norgle), the only means by which to determine from whence CHA's liability arose is to examine the allegations as framed in plaintiff's underlying Complaint.[6] Since CHA is only named in Counts VII, VIII and IX, we need only address the allegations contained therein.[7]

■ *Count VII. the federal § 1983 inadequate training policy claim.* In her § 1983 policy claim against the CHA, plaintiff alleged that the CHA, by and through its board and chairman, was responsible for the contracting, hiring, maintenance, supervision and control of private security companies contractually charged with the safety and welfare of CHA residents and their guests.[8] Plaintiff charged that the "CHA knew or should have known and contemplated that there existed a likelihood that a security guard, during the course of his [or her] employment at CHA and [due to] the high concentration of crime, populace and weapons, would likely have to resort to the use of force and/or deadly force in the performance of his [or her] duties." [9]

3. *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994).

4. *R.R. Donnelley & Sons,* 42 F.3d at 443.

5. *Id.*

6. While not cited as authority, the court finds helpful this framework for analysis as set forth in *Sears Roebuck & Co. v. Allied Commercial Corp.,* 53 F.3d 333, 1995 WL 241354 at p. 9, n. 7 (7th Cir.(Ill.)) (unpublished) (J. Easterbrook concurring).

7. Actually, we need only address Counts VII and VIII. Count IX was a sister count to Count VII, and using the allegations of Count VII as its predicate, sought injunctive relief against the CHA.

8. *Complaint,* at ¶ 69.

9. *Complaint,* at ¶ 65. As is too often the case, plaintiff takes great liberties with her allegations. As is evident from a review of the totality of her pleadings, the security guards were *not* employees of CHA, but rather were employees of Feder-

Plaintiff maintained that the "CHA did not provide training for the security guards contracted for to provide protective services,"[10] and that CHA's "inadequate training of the security guards as well as [inadequate] on-the-job training and supervision create[d] the opportunity and likelihood of the unconstitutional use of excessive force and deadly force against persons lawfully on CHA grounds and premises."[11] Specifically, plaintiff charged that the CHA did not properly investigate certain "shootings *[to-wit:* those occurring on July 24, 1989, August 7, 1989, August 8, 1989, October 31, 1989, July 19, 1990, May 23, 1990, April 19, 1991, and May 8, 1991], [or] train[ ] or retrain[ ][the] responsible security guards [or] adequately supervise[ ] said security guards who ... committed these [shootings] and other acts of violence, brutality, excessive force and deadly force against the residents, guests, and invitees of CHA, and otherwise negligently contracted with the within defendant security company [Federal] and *other* security companies similarly situated."[12] Continuing in this vein, plaintiff charged that the above mentioned shootings put CHA "on notice of prior unlawful and unconstitutional shootings by security guards working for companies under contract with CHA to provide security services."[13]

Plaintiff charged that the aforementioned acts and omissions *of CHA* constituted a CHA "policy, practice and custom of tacit and deliberate indifference to the illegal, reckless, wanton and willful conduct of Federal, their security guards and *other security companies*"[14], specifically, a "deliberate indifference and failure to further investigate shooting[s] by security companies and their guards, discipline or discharge the responsible security guards and/or sever the security

contracts with the defendant Federal and others, and/or retrain and instruct security guards on the use of force and deadly force."[15]

The thrust of the allegations of Count VII is that the CHA did not provide use of force training or *other similarly relevant training* to the security guards of the security companies with which it contracted for security services, and that its failure in this regard amounted to a CHA policy of deliberate indifference to the welfare and safety of CHA residents and their guests. On its face, the count states an extremely tenuous § 1983 policy claim against the CHA, since the CHA is in the business of operating and managing housing developments, and is *not* in the business of training and supervising the security guards of the various security companies with which it *contracts* for security services, and no where does plaintiff ever plead the latter. In any event, no matter how the allegations are viewed, *they are intended to assert a policy claim against CHA for CHA's acts and omissions.*

■ *Strict constraints limit municipal liability under 42 U.S.C. § 1983.*[16] It must be remembered, as recently noted by the United States Court of Appeals for the Seventh Circuit, that

[i]n *Monell v. Dep't of Soc. Serv. of City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978), the [United States] Supreme Court expressly restricted [§ 1983] such liability to cases in which "the action that is alleged to be unconstitutional *implements or executes a policy* statement, ordinance, regulation or decision *officially adopted and promulgated by that body's officers.*"[17]

---

al; and Federal was *-vis-a-vis* CHA—an independent contractor. Indeed, it has been judicially recognized that the CHA was "established for the purpose of developing property that provides safe and sanitary housing in Chicago, Illinois." *Smith v. Lyles,* 822 F.Supp. 541, 542 (N.D.Ill. 1993).

**10.** *Complaint,* at ¶ 63.

**11.** *Complaint,* at ¶ 68.

**12.** *Complaint,* at ¶ 67 (emphasis added).

**13.** *Complaint,* at ¶ 66.

**14.** *Complaint,* at ¶ 72 (emphasis added).

**15.** *Complaint,* at ¶ 73.

**16.** *Palmquist v. Selvik, Village of Bensenville,* 111 F.3d 1332, 1343–44 (7th Cir.1997).

**17.** *Id.* (emphasis added)

Thus, in order to impose a § 1983 liability upon CHA, plaintiff would have to establish at trial a causal nexus between her injury and the CHA's alleged policy or custom.[18] A lesser standard of fault and causation would risk creation of *de facto respondeat superior* liability, which would be contrary to *Monell.*[19]

The § 1983 policy hurdle before the plaintiff is difficult to overcome. Under Article 15 of the Contract, Federal agreed that all security personnel assigned under the contract would be in compliance with all federal, state and municipal requirements as to licensing, character, experience and *training,* as well as in compliance with other relevant requirements, including but not limited to,

> (a) Completion of an approved 20–Hour Basic Training Course For Private Security Agency Employees, and
>
> (b) Completion of an approved Firearm Training Course.

Federal represented and warranted that it was a licensed "Private Security Contractor" under the laws of the State of Illinois and, further, that it was in good standing thereunder.

Under Seventh Circuit decisional law, a charge that CHA failed to provide the security guards under contract with specialized training necessary to handle use of force situations would—without more—be a legally insufficient pleading. The equation of *"no special training = deficient training"* is not a *sine qua non* to victory at trial.[20] It simply is not enough for plaintiff to show that the CHA failed to train its contract security guards in a relevant respect. Albeit, the training actually received by the security guards cannot be ignored, *solely* showing that the shooting of the decedent could have been avoided if the security guards had had better or more training would not—standing

alone—ensure success at trial in the Seventh Circuit.[21]

■ Training inadequacies of law enforcement personnel may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom law enforcement comes into contact.[22] As elucidated by the United States Supreme Court,

> Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality—a "policy" as defined by our prior cases—can a city be liable for such a failure under § 1983. *Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation *will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible* .... [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it causes injury.[23]

*"A failure to train" charge is available to a plaintiff only in very limited circumstances.*[24] It goes without saying that the identified deficiency in the training program must be closely related to the ultimate injury.[25] However, to prevail on her claim in this regard, plaintiff herein must show not only that the CHA failed to train its contract

**18.** *Id.*

**19.** *Cornfield By Lewis v. Consolidated High School Dist. No. 230,* 991 F.2d 1316, 1327 (7th Cir.1993).

**20.** *Palmquist,* 111 F.3d at 1345.

**21.** *Id.*

**22.** *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989).

**23.** *Palmquist,* 111 F.3d at 1334 (citation omitted) (emphasis added).

**24.** *Cornfield,* 991 F.2d at 1327.

**25.** *City of Canton,* 489 U.S. at 391, 109 S.Ct. at 1206.

security guards in a "relevant respect," but that the failure to train evidenced a deliberate indifference to its residents' rights.[26] In endeavoring to show that the training was inadequate, plaintiff would have to focus upon the program itself, not whether the particular guards were adequately trained.[27] As noted by the United States Court of Appeals for the Seventh Circuit,

> In order to ensure that isolated instances of misconduct are not attributable to a generally adequate policy or training program, we require a high degree of culpability on the part of the policymaker. Coupled with a causation requirement, this standard ensures that the violation alleged is not too far removed from the policy or training challenged as inadequate. Taken together, these two considerations amount to a requirement that liability be based on a finding that the policymakers have actual or constructive notice that a particular omission ... is likely to result in constitutional violations.[28]

Under the above-quoted rigid legal framework, plaintiff herein would be required to establish at trial that the CHA failed to train the security guards of private security companies with which it contracted for security services, or that it negligently selected and hired security companies with security guards poorly trained in the use of force, and that it did one or the other with deliberate indifference to the welfare of CHA residents. Again, no matter how one views the matter, the required evidentiary proof is directed towards the acts or omissions of CHA—not Federal.

■ Clearly, CHA has no formal policy favoring the unfettered fatal shooting of its residents. What plaintiff would have had to prove at trial was the existence of a *de facto* policy, and to do so by showing that there was a deliberate indifference **by CHA** to a specific pattern or series of incidents violative of constitutional rights.[29] A pattern or practice of unconstitutional conduct is a basis for liability under § 1983.[30] Proof of a single incident of unconstitutional conduct would be insufficient to sustain a § 1983 claim.[31] In any event, at trial plaintiff would have to prove a **de facto CHA policy** by showing that CHA had a pattern or practice of displaying deliberate indifference to constitutional violations.

In plaintiff's Complaint, the only constitutional violation allegedly perpetrated by Federal was the single isolated incident involving the fatal shooting of decedent Hightower. Plaintiff cited at least eight other incidents of alleged constitutional violations to support its policy claim against CHA. Each incident involved a security company **other** than Federal.[32]

The single isolated incident involving Federal could not, as a matter of law, establish a § 1983 policy claim.[33] Although the Federal incident was one of nine incidents that formed the predicate for plaintiff's charge of inadequate use of force training against CHA, it was not a *sine qua non* of CHA's liability.[34] Success on plaintiff's § 1983 claims would have been predicated on proving past constitutional violations of third-party security firms **and** a corresponding deliberate indifference **on the part of CHA.** Thus, the gravamen of liability would come from CHA's prior conduct which was obviously beyond Federal's control. We therefore hold that any liability attributable to

**26.** *See, Palmquist,* 111 F.3d at 1344–45; and, *Cornfield,* 991 F.2d. at 1327.

**27.** *Palmquist,* 111 F.3d at 1345.

**28.** *Id.* (citation omitted)

**29.** *Thomas v. Cannon,* 751 F.Supp. 765, 768–70 (N.D.Ill.1990).

**30.** *Cornfield,* 991 F.2d at 1326.

**31.** *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791, (1985), *reh'g denied,* 473 U.S. 925, 106 S.Ct. 16, 87 L.Ed.2d 695 (1985); *Cornfield,* 991 F.2d at 1327; *Thomas,* 751 F.Supp. at 770.

**32.** *See,* Count VII of *Complaint.*

**33.** *See,* note 31 *supra.*

**34.** *Cf., Sears Roebuck,* 1995 WL 241354 p. 9 (J. Easterbrook concurring)

plaintiff's § 1983 policy claim must be considered a result of CHA's direct negligence.[35]

***Count VIII, styled a "common law negligent hiring and retention" claim*** charges that CHA employed Federal and other private contract security companies to perform law enforcement and public safety services corresponding to those powers possessed by municipal police officers. In actuality, asserted plaintiff, the "private armed guards contracted for had no powers of law enforcement that exceeded those of a private person." [36]

Plaintiff claimed that CHA circumvented Illinois' compelling state interest in effective, accountable and professional law enforcement by its delegation of substantially similar services to private contractors.[37] Continuing in this vein, plaintiff charged that CHA "implicitly vested these armed security guards with the implements and responsibilities of municipal police without the concomitant, statutorily-required accountability or appropriate training" of the Illinois Police Training Act.[38] On its face, this aspect of Count VIII has absolutely nothing to do with Federal or any one of the many security firms hired and retained by CHA. Rather, it is a challenge to CHA's very ***act*** of contracting for protective services. Plaintiff denounces CHA's conduct in this regard; preferring in lieu thereof that CHA hire and maintain its own police force.

In any event, continuing in this vein, plaintiff charged that the "law-enforcement function of the armed private security guards implicitly render[ed] them untrained, unqualified and unaccountable as a matter of law in that the armed guards were:

(a) not trained or required to attain and maintain proficiency in the maintenance of the Constitutional rights of persons on CHA properties;

(b) not trained or required to attain and maintain proficiency in the use of force and deadly force;

(c) not trained or required to be psychologically tested;

(d) not adequately trained in the law and standards pertaining to the use of deadly force;

(e) not trained as to the prevention and/or discouragement of the reckless and/or unlawful use of deadly force."[39]

Accordingly, asserted plaintiff, the inadequate training, hiring qualifications, and accountability required by the Contract as between the parties was negligently inadequate.[40] The gist of Count VIII's allegations in this regard is that unless privately retained security guards have received training at police training academies or equivalent institutions they are ***perforce*** inadequately trained. ***Monell*** does not permit success on such a sweeping charge.

Finally, plaintiff charged that the CHA's negligent hiring of Federal as well as its continued and negligent retention of Federal increased the danger and likelihood of death or great bodily harm to the decedent and others similarly situated, ***and that this negligent hiring and retention was the direct and proximate cause of the injury and death of the decedent.***[41]

In passing, we note that with respect to plaintiff's charge that the CHA's Contract specifications were inadequate because they failed to require drug testing and psychological evaluations of Federal security guards, plaintiff ***never*** alleged that a Federal security guard suffered from a psychological defect or drug problem that resulted in the shooting death of the decedent. Consequently, no Contract deficiencies in this regard could possibly have been the proximate cause of

---

35. Cf., *Bates v. Select Lake City Theater Operating Co. Inc.*, 78 Ill.App.3d 153, 33 Ill.Dec. 742, 745, 397 N.E.2d 75, 78 (1979) (finding it unreasonable to impose duty to indemnify on party who lacked ability or means to correct negligently maintained steps).

36. *Complaint,* at ¶ 81.

37. *Complaint,* at ¶ 83.

38. *Complaint,* at ¶ 85.

39. *Complaint,* at ¶ 87.

40. *Complaint,* at ¶ 88.

41. *Complaint,* at ¶¶ 91, 92 (emphasis added).

the decedent's death.[42] In any event, notwithstanding plaintiff's deficient pleading in this regard, the Contract did in fact require drug testing and psychological evaluations.[43]

As for plaintiff's allegation that CHA negligently hired, supervised and retained Federal, the complaint is, again, legally insufficient. To state a cause of action for negligent hiring or retention it must be alleged that the employer knew or should have known that the employee was unfit for the job and that a particular unfitness created a foreseeable danger to others.[44] Plaintiff's complaint lacks any such allegation that CHA knew or should have known of any particular fact which would have made Federal unfit either at the time the Contract was executed or at any time prior to the incident causing decedent's death.

To state a claim for negligent supervision, a complaint must allege that an employer failed to act when it knew or should have known of improper employee conduct.[45] There are no such allegations in the complaint—presumably, because there was no improper conduct by Federal security guards of which CHA was aware or should have been aware.

Since plaintiff's discovery efforts and pursuits were not directed towards proving the elements of negligent hiring or negligent supervision; at trial, plaintiff would not have had the evidence necessary to show that the CHA knew or should have known that Federal security guards, in general, or that Federal Security Officers Harris and Loggins, in particular, were unfit for the job. Indeed, there is no evidence that CHA had ever dealt with or knew of Federal prior to 1991, or that CHA had ever dealt with or knew of Officers Harris and Loggins prior to December 9, 1991. Thus, it is unlikely that CHA would have incurred any liability on these allegations.

In any event, assuming for the sake of argument only that Count VIII was properly pled, any CHA liability arising out of this count stemmed solely from the acts or omissions of CHA, and not Federal or its agents. As a result, CHA would not be entitled to indemnification.[46]

The only part of Count VIII which arguably states a claim is plaintiff's allegation that CHA negligently set forth inadequate hiring qualifications and inadequate training requirements in the Contract. Although the Illinois Private Detective, Private Alarm, and Private Security Act of 1983 [47] gives the state exclusive authority to regulate the private security industry and prohibits local units of government from doing so,[48] the following language leaves open the question of whether CHA was negligent in not requiring additional training:

> ... nothing shall prevent any employer from providing or requiring any additional training, beyond the required 20 hours, that the employer feels is necessary and appropriate for competent job performance.[49]

Yet, the crucial question is not whether CHA could be liable on this claim. The issue is

---

42. *Smith v. Lyles*, 822 F.Supp. 541, 545 (N.D.Ill. 1993) (a complaint devoid of any allegation that a security guard has a psychological defect or a violent criminal history, has failed to allege that any avowed negligence in this area *caused* the injuries sustained) (emphasis added)

43. *See*, Contract, Article 15 providing in part: "[t]he Contractor shall subject each employee to appropriate psychological testing, including a 'personality' inventory. In addition, employees will be required to submit to a drug test to reinforce CHA's commitment to a drug free workplace."

44. *Giraldi v. Community Consolidated School District No. 62*, 279 Ill.App.3d 679, 216 Ill.Dec. 272, 279, 665 N.E.2d 332, 339 (1996).

45. *Rubin v. Yellow Cab Co.*, 154 Ill.App.3d 336, 107 Ill.Dec. 450, 452, 507 N.E.2d 114, 116 (1987); *Dockter v. Rudolf Wolff Futures, Inc.*, 684 F.Supp. 532, 536 n. 3 (N.D.Ill.1988).

46. *See, Smith v. Chicago Housing Authority*, 187 Ill.App.3d 798, 135 Ill.Dec. 284, 288, 543 N.E.2d 852, 856 (1989) (finding CHA not entitled to indemnification under contract with private security firm for plaintiff's claim of negligent hiring).

47. 225 Ill.Comp.Stat. 445/1 et. seq.

48. 225 Ill.Comp.Stat. 445/7, 445/10.

49. 225 Ill.Comp.Stat. 445/27.

whether liability would come from CHA's direct negligence.

As noted earlier, Judge Easterbrook's illustration of the concept of direct negligence in *Sears Roebuck* is of assistance in analyzing this issue:

> The standard cases of direct negligence for which indemnity is presumptively unavailable are those in which the employer sets the ground rules or supplies a defective product. Employer tells Agent to spray the crops with Fungicide X, as a result of which Farm Hand dies. The employer's choice of Fungicide X (rather than Y or Z) is to blame. Here, even a contractual promise by Agent to indemnify Employer probably would not be enforced.[50]

The above-quoted illustration describes the factual scenario in this case. Here, CHA set the "ground rules" by setting forth the hiring qualifications and training requirements in the Contract. Decedent was killed by Federal employees who were hired and trained pursuant to these requirements. Thus, if CHA's decision not to set higher standards is blameworthy, such blame would accordingly be deemed CHA's direct negligence and would preclude indemnification.

*In summary,* under the Contract Federal agreed to completely indemnify and hold CHA harmless against any liability or expense arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of Federal or its agents in the performance of the contract. Our review of the allegations of Counts VII and VIII shows unequivocally that liability on the claims asserted therein stem from CHA's own direct negligence. Consequently, Federal is under no obligation to indemnify CHA.

**Indemnification For One's Own Negligence.** Our reading of the Federal–CHA Contract is buttressed by the fact that any other interpretation would be contrary to Illinois public policy. Illinois law strongly disfavors contractual indemnification for one's own negligence, and courts strictly construe such clauses against the indemnitee.[51] Absent explicit language assuming an obligation to indemnify a party for liability arising out of that party's own negligence, such a construction will not be given to an indemnification clause.[52] A broadly-phrased, non-specific indemnity clause will not demonstrate an intent to indemnify a party for its own negligence.[53]

CHA points to the decisions in *Smith II*[54] and *Mitchell v. Allen*[55] to support its claim for indemnification. It is true that in both cases, the court construed language in contracts between CHA and private security firms that was identical to the language of the Contract between CHA and Federal herein, *to-wit:*

> "... Contractor agrees to completely indemnify and hold harmless CHA.. against any liability or expense.. arising out of any losses, claims, damages or injury *resulting from any intentional acts or any negligent acts or omissions of contractor or its agents ...*" (emphasis added)

Both courts found that the above-quoted language entitled CHA to indemnification *even* for its own negligence.[56]

In *Mitchell* however, the question of whether indemnification was proper for one's own negligence received only cursory and conclusory analysis since it was not raised by the security company.[57] Accordingly, we do not find *Mitchell* persuasive.

The court in Smith found that such language "clearly and explicitly" showed the

---

**50.** 1995 WL 241354 at 9.

**51.** *Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir.1996); *Ralston v. Gallo Equipment Co.,* 749 F.Supp. 179, 180 (N.D.Ill.1990).

**52.** *Ralston,* 749 F.Supp. at 180; *Westinghouse Electric Elevator Co. v. LaSalle Monroe Bldg. Corp.,* 395 Ill. 429, 70 N.E.2d 604, 607 (1946). *See also, Anderson v. Nashua Corp.,* 251 Neb. 833, 560 N.W.2d 446, 451 (1997).

**53.** *Ralston,* 749 F.Supp. at 181.

**54.** *See, Smith v. Lyles,* 839 F.Supp. 18, 20 (N.D.Ill.1993) (*Smith II* ).

**55.** 1994 WL 66099 (N.D.Ill.) (unreported)

**56.** *Smith II,* 839 F.Supp. at 20; *Mitchell,* 1994 WL 66099 at 6 n. 6.

**57.** *Mitchell,* 1994 WL 66099 at 5.

parties' intent to provide indemnity to CHA even for liability arising out of its own negligence.[58] Respectfully, we disagree.

■ *The Protective Services Contract between the Parties does not indemnify CHA for its intentional or negligent acts or omissions.* As noted earlier, construing the indemnification clause according to the plain meaning of the language [59] shows no explicit agreement by Federal to indemnify CHA for CHA's own negligence.

*The language of the contract clearly states* that Federal only agreed to completely indemnify and hold CHA harmless against any liability arising out of any losses, claims, damages or injury resulting from any intentional acts or any negligent acts or omissions of Federal or Federal's agents in the performance of the Contract. As demonstrated above, the claims against the CHA arose out of its policies and practices, and its direct negligence. Had Federal intended to indemnify CHA for CHA's intentional and negligent acts, the Contract would have stated that Federal agrees to completely indemnify and hold CHA harmless against any liability arising out of any losses, claims, damages or *injury resulting from any intentional acts or any negligent acts or omissions of Federal or CHA or their respective agents.* It does not so read. Accordingly, we hold that the indemnity clause does not entitle CHA to indemnification for its own direct negligence or intentional conduct. Our interpretation is consistent with Illinois decisional law which frowns upon contracts that indemnify a party for its intentional or negligent acts.

Indeed, the inaction and non-feasance alleged in Counts VII and VIII are precisely the type of carelessness which should not be subject to indemnification.[60] It would be neither fair nor reasonable to so interpret the Contract.

Although the underlying facts of Counts VII and VIII touch upon alleged intentional or negligent acts of Federal and its agents, nevertheless, a clear distinction exists between CHA's acts and omissions and those of Federal and its guards. This is not a case where CHA is free from wrongdoing. CHA's liability arose from its own acts and omissions, and not because of its contractual relationship with Federal. CHA should incur liability for its own conduct, and should only receive indemnification if its liability is based solely on a contractual relationship with a primary tortfeasor.[61]

In the present case, assuming for the sake of argument that the claims against CHA were viable, CHA could have incurred liability in its own right under the § 1983 policy claim or the negligent failure to hire, supervise, and train theory. Both claims were born out of the incident involving Federal security guards. However, success on either would require foundational proof of inaction by CHA.

Success on the § 1983 policy claim is dependent upon proving that CHA had a pattern or practice of displaying deliberate indifference to civil rights violations inflicted by security firms under contract with it. Perforce, this would necessarily require proof that the pre-December 1991 shooting incidents involving other security guards of security companies other than Federal (of which there are many) were the result of inadequate training on the use of deadly force.

---

58. *Smith II*, 839 F.Supp. at 20.

59. *Montgomery Ward & Co. v. Wetzel*, 98 Ill. App.3d 243, 53 Ill.Dec. 366, 373, 423 N.E.2d 1170, 1177 (1981) (unless contract is ambiguous, indemnification clause will be construed from plain meaning of words used).

60. *See, e.g., Chicago, Rock Island and Pacific Railroad Co. v. Chicago, Burlington and Quincy Railroad Co.*, 437 F.2d 6, 9 (7th Cir.1971), *cert. denied*, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971) (indemnity clause encouraging indemnitee's carelessness would be contrary to concern for public welfare and policy); *Bates*, 33

Ill.Dec. 742, 397 N.E.2d at 78 (indemnification should not provide disincentive to take steps to ensure public safety).

61. *See, e.g., Lohman v. Morris*, 146 Ill.App.3d 457, 100 Ill.Dec. 263, 266, 497 N.E.2d 143, 146 (1986) (party not entitled to indemnification where actively negligent despite active negligence of second tortfeasor); *Hanson v. Cresco Lines, Inc.*, 57 Ill.App.3d 168, 14 Ill.Dec. 657, 662, 372 N.E.2d 936, 941 (1978) (party who was actively negligent will not be indemnified regardless how other tortfeasor's negligence is characterized).

However, even if plaintiff were to establish that the various security firms all hired by CHA, including Federal, all provided their guard personnel with constitutionally deficient use of force training, such proof would be insufficient for plaintiff to recover on her claim. To recover, she must show, among other things, that the CHA knew or should have known of this training deficiency, and notwithstanding its knowledge in this regard, it hired and retained Federal and the other security firms.

Success on the negligent hiring and retention claim would require proof that CHA knew or should have known that Federal provided their security guard personnel with constitutionally deficient use of force or comparable training. Under either count, it remains key that it is the acts or omissions of CHA and *CHA alone* which trigger liability. Either count would therefore have at its root proof that CHA had a dubious history of inaction.

Accordingly, we find that the only basis for CHA's liability on the claims in the Complaint is CHA's direct negligence. Therefore, there is no genuine issue of material fact which could lead to CHA's recovery on the indemnity clause.[62]

■ *CHA's breach of contract claim.* Federal is not relieved of its duty to obtain insurance simply because we have relieved it of its duty to indemnify CHA. Regarding this matter, we must first determine whether a valid contract to provide insurance was created between CHA and Federal and, second, whether under that contract Federal agreed to provide liability insurance to protect CHA against claims arising out of CHA's own negligence. We conclude that a valid agreement to provide insurance was created, but that the contract does not contain express or clear and unequivocal language that the parties intended for Federal to provide liability insurance to protect CHA against CHA's own negligence.[63]

■ Indeed, as we interpret the Contract, Federal is only required to protect CHA from the acts and omissions of Federal and its agents. We have held that the indemnification clause could not under any circumstances be read to require Federal to indemnify CHA against CHA's own direct negligence or intentional acts and omissions since the Contract language does not call for it and because that would be against Illinois public policy.[64] These same public policy concerns would also preclude enforcement of any insurance procurement clause to the same effect.

■ But even if we found the Contract required Federal to insure CHA against liability resulting from CHA's own negligence, CHA would still not be entitled to win on its breach of contract claim. As a matter of law, where a contractual provision requiring the acquisition of insurance is inextricably linked to a void indemnification provision, the otherwise valid insurance clause is also void.[65]

We have held that the *Protective Services Contract* between the parties does not require Federal to indemnify CHA for its direct negligence. Since Federal was only contractually obligated to indemnify CHA against Federal's acts or omissions, perforce the insurance coverage that Federal was to obtain was to insure CHA against the negligent acts and omissions of Federal. Since we have concluded that the claims against CHA stem from CHA's direct negligence, had Federal obtained the contractually required insurance, there would have been no coverage for CHA, because only the acts of Federal and its agents would have been insured. Insurance for CHA's direct negligence was not required by the contract.

---

**62.** *Cf., Lohman,* 100 Ill.Dec. 263, 497 N.E.2d at 146 (question need not go to jury where pleadings from underlying action show party's conduct can only be characterized as active negligence).

**63.** *See, e.g., Anderson,* 560 N.W.2d at 449.

**64.** Clearly, under Illinois decisional law, indemnification for one's own intentional acts is not permitted. Accordingly, this same Illinois public policy would preclude enforcement of an insurance clause ensuring against a party's intentional acts.

**65.** *Juretic v. USX Corp.,* 232 Ill.App.3d 131, 173 Ill.Dec. 186, 188, 596 N.E.2d 810, 812 (1992).

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. *"Federal Security, Inc.'s Motion For Summary Judgment"* is hereby granted.

2. The *"Chicago Housing Authority's Cross Motion For Summary Judgment"* is hereby denied.

*So Ordered.*